IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SALLAH HAMAMIN ABDULLA | : | CIVIL ACTION |
| | : | |
| v. | : | No. 12-2590 |
| | : | |
| THE EMBASSY OF IRAQ AT | : | |
| WASHINGTON, DC | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                                **September 9, 2013**

Pro se Plaintiff Sallah Hamamin Abdulla asks this Court to enter a default judgment against the Embassy of Iraq at Washington, DC (the Embassy) in this breach of contract action. Having previously determined the Embassy qualifies as a "foreign state" for purposes of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602–1611 (2012), and is therefore presumptively immune from suit unless a specific statutory exception to immunity applies, this Court, by Order of March 6, 2013, established a two-step process for considering the instant motion for default judgment. *See* ECF No. 33. The first step consists of a determination whether this action falls within the "commercial activity" exception to sovereign immunity set forth in 28 U.S.C. § 1605(a)(2), the sole exception on which Abdulla relies. The second step consists of a determination whether Abdulla has met his burden under 28 U.S.C. § 1608(e) to "establish[] his claim or right to relief by evidence satisfactory to the court."

Upon review of Abdulla's submissions and case law regarding the commercial activity exception, the Court concludes this action falls within the exception. Although the Order establishing the foregoing two-step process contemplates that in the event the step one inquiry is resolved in Abdulla's favor, the Court will schedule a hearing to provide Abdulla an opportunity to present evidence in support of his claim, Abdulla maintains a further hearing is unnecessary and urges the Court to grant a default judgment based on the documentary evidence in the

record.  *See* Pl.'s Mem. in Supp. of Mot. for Default J., ECF No. 38.  For the reasons set forth below, however, this Court finds the evidence in the existing record is insufficient for the Court to conclude that Abdulla has established his breach of contract claim.  As a result, Abdulla's motion for default judgment will be denied based on the current record.

**BACKGROUND**

In his Complaint, filed in June 2012, Abdulla sues the Embassy for breach of contract, alleging the Iraqi government breached a contract in which it agreed to pay his tuition and living expenses for three years while he obtained a Ph.D. in the United States.  According to the Complaint, the Embassy paid Abdulla's tuition at the University of Arkansas at Little Rock (UALR or the University) for one year; however, in April 2010, Embassy personnel informed him he would no longer be funded.  The Complaint seeks damages in the amount of $178,909.15, consisting of $28,109.15 for tuition and fees Abdulla has paid since the Embassy cut off his funding, $50,800.00 for "living expenses and other stipends for the past 2 years," and $100,000.00 for "the amount of obligation of the contract that was a property already been confiscated by the defendant."  Compl. ¶ V.

At this Court's request, in April 2013, Abdulla produced an English translation of the "Scholarship Contract" he contends the Embassy breached.  The Contract identifies the parties thereto as the Iraqi Minister of Higher Education and Scientific Research (the Minister) "in his official capacity as well as whoever represents him" and "[t]he student," i.e., Abdulla.[1] Scholarship Contract 1, ECF No. 34 at 4.  In the Contract, the Minster agreed to fund Abdulla's

---

[1] Although the Contract itself is between the Minister and Abdulla, the Embassy appears to have been responsible for administering Abdulla's funding under the Contract.  *See* ECF No. 6 at 7 (letter from the Minister, addressed "To Whom It May Concern," advising the recipient Abdulla "has been nominated to get Ph.D. Degree in the field 'Communication and Networks,'" and stating his tuition and living expenses will be "covered by Iraqi government/MOHESR through the Embassy of Republic of Iraq in the intended country").

studies to obtain "a Ph. D. degree in the field of telecommunication and networks from [the] United States within three years," including paying his airfare, tuition fees, educational and living expenses (including education-related travel expenses), and health insurance fees, in exchange for Abdulla's agreement to return to Iraq and work for the Iraqi government for a period of "double the duration of his study," among other obligations. *Id.* at 1-2, ECF No. 34 at 4-5. The Contract does not specify the capacity in which Abdulla will be employed upon his return or the nature of the work he will perform, instead leaving those matters entirely to the discretion of the Iraqi government. *See id.* at 2, ECF No. 34 at 5 (providing "[u]pon graduation, the second party shall be required to work in the agencies of the Republic of Iraq, in those projects and business determined by the state for a period of double duration of his study" and "[h]is employment and the amount of his salary will be determined upon rules valid on the day of employment"). Although the Contract includes a number of provisions regarding Abdulla's obligation to repay funds spent on him if he fails to satisfy his contractual duties, it appears to contemplate that no such repayment obligation will arise in the event the Iraqi government does not employ him within a year of his return. *See id.* at 3, ECF No. 34 at 6 ("This contract shall be considered nil if the first party [i.e., the Minister] fails to employ him within one year of his request for employment upon returning to Iraq."). The Contract also includes a forum selection clause, providing "[t]he courts of Baghdad shall have jurisdiction over suits arising out of carrying out the contract."[2] *Id.*

In July 2012, approximately one month after the Complaint in this case was filed, Abdulla promptly filed an initial motion for default judgment, which this Court denied without

---

[2] Because the Court finds Abdulla has not established his right to relief for the other reasons set forth below, the Court need not address whether the forum selection clause is mandatory or permissive.

prejudice to reassertion after Abdulla first sought and obtained entry of the Embassy's default by the Clerk of Court. When Abdulla thereafter filed a request for entry of the Embassy's default and a renewed motion for default judgment, the Court again denied the motion without prejudice, finding the Embassy qualified as a "foreign state" for purposes of the FSIA and Abdulla was therefore required to serve the Embassy pursuant to 28 U.S.C. § 1608. On December 16, 2012, Abdulla effected service on the Embassy pursuant to § 1608(a)(3) by forwarding a copy of the summons, Complaint, and a notice of suit, together with a translation of each, to the Clerk of Court, who mailed these materials to the head of the Iraqi Ministry of Foreign Affairs by DHL Express. *See* ECF Nos. 22, 26, 27 & 30. Sixty days later, on February 15, 2012, Abdulla requested entry of the Embassy's default, and default was entered the same day. Abdulla thereafter filed the instant motion for a default judgment.

## DISCUSSION

### A.      Sovereign Immunity

Under the FSIA, a foreign state is presumptively immune from the jurisdiction of the courts of the United States, subject to certain enumerated exceptions. 28 U.S.C. § 1604. Once a defendant has made a prima facie showing that it is a foreign state (or where, as here, it is apparent from the pleadings that the defendant is a foreign state), the burden shifts to the plaintiff to produce evidence establishing that one of the exceptions to immunity applies.[3] *Fed. Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270, 1285 & n.13 (3d Cir. 1993) (noting the FSIA's

_____

[3] Because the district courts have subject matter jurisdiction over an action against a foreign state only if an exception to immunity applies, *see* 28 U.S.C. § 1330(a), a court must consider the immunity issue as part of its duty to assure itself of its own jurisdiction, even if the foreign state does not assert immunity as a defense. *See Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) (holding the presumption of immunity applies not only when the defendant has made a prima facie showing that it is a foreign state, but also "if it is apparent from the pleadings or uncontested that the defendant is a foreign state").

legislative history reflects Congress's intent to create a burden-shifting process for the defense of immunity); *see also Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 940 (D.C. Cir. 2008) (holding to the extent jurisdiction depends on particular factual propositions, the plaintiff has a burden of production with respect to such facts); *Rodriguez v. Transnave Inc.*, 8 F.3d 284, 287 n.6 (5th Cir. 1993) (characterizing the burden-shifting process as requiring the plaintiff "to raise the exceptions to sovereign immunity and assert at least some facts that would establish the exceptions"). The ultimate burden of proving immunity, however, rests with the state. *Fed. Ins. Co.*, 12 F.3d at 1285 & n.13 (citing H.R. Rep. No. 94-1487, at 17 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6616); *see also Agudas Chasidei Chabad*, 528 F.3d at 940. If the plaintiff satisfies his burden of production, "jurisdiction exists unless the defendant demonstrates by a preponderance of the evidence that the claimed exception does not apply." *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010).

Here, Abdulla invokes only the "commercial activity" exception, which provides a foreign state is not immune in any case

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). For purposes of the FSIA, "commercial activity" means "either a regular course of commercial conduct or a particular commercial transaction or act," *id.* § 1603(d), and "commercial activity carried on in the United States by a foreign state" means "commercial activity carried on by such state and having substantial contact with the United States," *id.* § 1603(e). The Act also specifies "[t]he commercial character of an activity shall be

determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d).

The Supreme Court has interpreted the FSIA as having "largely codifie[d] the so-called 'restrictive' theory of foreign sovereign immunity first endorsed by the State Department in 1952," under which "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*)." *Saudi Arabia v. Nelson*, 507 U.S. 349, 359-60 (1993) (internal quotation marks and citations omitted). Under the restrictive theory (and thus under the Act), a foreign state engages in commercial activity "where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Id.* at 360 (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)). In other words, "a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts 'in the manner of a private player within' the market." *Id.* (quoting *Weltover*, 504 U.S. at 614). Because an act's commercial character is to be determined based on the nature of the act rather than its purpose, *see* 28 U.S.C. § 1603(d), "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives," but "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Weltover*, 504 U.S. at 614 (citation omitted).

Without specifying the particular clause of § 1605(a)(2) on which he is relying, Abdulla argues the Scholarship Contract constitutes commercial activity because private companies enter into similar agreements to fund a person's education in exchange for the person's promise to work for the company upon graduation.

Although this Court has found no FSIA case directly on point, Abdulla is correct that private companies can and do enter into education funding arrangements similar to the arrangement at issue here. *See, e.g.*, *Hulse v. Orthodontic Educ., Ltd*, No. 05-594, 2011 WL 32437, at *1 (M.D. Fla. Jan. 5, 2011) (describing agreement whereby defendant was to pay for plaintiff's orthodontic education and plaintiff in exchange was to work in an orthodontic practice managed by defendant for a minimum of seven years). At least one court has observed that a foreign state–owned company's support of its employee in an American MBA program was "certainly one type of activity by which private parties trade and traffic in commerce." *Anglo-Iberia Underwriting Mgmt. Co. v. Lodderhose*, No. 97-84, 2008 WL 190364, at *2 n.6 (S.D.N.Y. Jan. 22, 2008), *aff'd*, 600 F.3d 171 (2d Cir. 2010).[4]

Because the Scholarship Contract requires Abdulla to repay all funds spent on him—and, in some instances, double that amount—in the event he fails to fulfill his contractual obligations, the Contract has attributes of a loan agreement.[5] *See U.S. Dep't of Health & Human Servs. v.*

---

[4] *Lodderhose* involved a suit against the Republic of Indonesia and the state-owned social security insurer (Jamsostek) alleging, inter alia, negligent supervision of Jamsostek employees who perpetrated an international commercial reinsurance fraud, one of whom was pursuing a Jamsostek-sponsored MBA in the United States at the time the fraud was perpetrated. The plaintiffs argued the negligent supervision claim fell within the FSIA's commercial activity exception in part because Jamsostek's funding of its employee's participation in an American MBA program constituted commercial activity by Jamsostek in the United States. 2008 WL 190364, at *2 n.6. The district court agreed Jamsostek's "training of its staff is certainly one type of activity by which private parties trade and traffic in commerce." *Id.* The court nevertheless held the commercial activity exception was inapplicable, however, finding Jamsostek's support of its employee in a U.S.-based MBA program was "incidental to his employment in insurance activities," the conduct on which the plaintiffs' negligent supervision claims were based. *See id.* (noting the negligent supervision claim was "based on Jamsostek's alleged negligent supervision of [its employee's] employment," a claim which "ha[d], at best, a 'mere connection' with [the employee's] education program").

[5] The Contract requires Abdulla to repay all funds spent on him in the event he does not obtain a Ph.D. and requires him to repay double the amount spent on him if he fails to return to Iraq, fails in his studies, or fails to fulfill his post-graduate employment obligation, among other

*Smith*, 807 F.2d 122, 125 (8th Cir. 1986) (holding a government agency's agreement to finance a student's medical training on the condition that he would practice in a physician shortage area upon completion of his training was a loan where the scholarship agreement permitted the government to recover the amount of the scholarship grant plus interest in the event the student failed to engage in the required practice post-graduation). Insofar as the Contract is regarded as a type of loan agreement, the Iraqi government's actions in entering into the Contract, funding Abdulla pursuant to the Contract, and allegedly breaching its obligations thereunder would appear to constitute commercial activity, irrespective of the educational purpose of the funding. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994) (holding a suit against a commercial bank wholly owned by the Republic of Iraq and Iraq's central banking authority concerning the defendants' failure to meet obligations under loan agreements and letters of credit came within the commercial activity exception); *Fed. Ins. Co.*, 12 F.3d at 1291 (holding a Dutch defendant "undert[ook] commercial activity in the Netherlands by means of providing a loan to [another party] and collecting payments on that loan"); *cf. Sun v. Taiwan*, 201 F.3d 1105, 1107-08 (9th Cir. 2000) (holding Taiwan's promotion and operation of a cultural tour constituted commercial activity notwithstanding that Taiwan did not charge tour participants and ran the tour for the purpose of promoting an understanding of Chinese culture and fostering closer ties among Chinese people).

Although the Scholarship Contract has some similarity to a loan agreement, because it conditions the funding of Abdulla's education on his agreement to work for the Republic of Iraq for a period of six years, it also has attributes of an employment contract, making this case

---

contingencies. The Contract treats the scholarship funds advanced to Abdulla as a debt in the event he "fail[s] to carry out the contract or violates its conditions and rules." *See* Scholarship Contract 3, ECF No. 34 at 6.

somewhat analogous to cases addressing the commercial activity exception in the employment context. While the FSIA itself does not address whether (or when) an employment contract constitutes commercial activity, the Act's legislative history provides some guidance, specifying a foreign state's "employment of diplomatic, civil service, or military personnel" is regarded as "governmental and not commercial in nature," but that a state's "employment or engagement of laborers, clerical staff or public relations or marketing agents . . . would be among those [activities] included within the definition [of commercial activity]." H.R. Rep. No. 94-1487, at 16. In light of this distinction, courts addressing claims for breach of an employment contract by a foreign state (or other claims arising out of a plaintiff's employment by a foreign state) have looked to the nature of the employment relationship between the plaintiff and the foreign state to determine whether the employment constitutes commercial activity for purposes of the FSIA, considering such factors as the capacity in which the plaintiff was employed and the nature of the plaintiff's job responsibilities in making this determination.[6] *See, e.g.*, *El-Hadad v. United Arab Emirates*, 496 F.3d 658, 664-65 (D.C. Cir. 2007); *Kato v. Ishihara*, 360 F.3d 106, 111-12 (2d

---

[6] The Third Circuit has not addressed the commercial activity exception as applied to an employment contract. In *Velidor v. L/P/G Benghazi*, the Third Circuit held a wage claim by Yugoslavian seamen against the owner of the vessel on which they were working fell within the commercial activity exception. 653 F.2d 812 (3d Cir. 1981). In so holding, however, the court rejected the defendant's characterization of the suit as one for breach of the plaintiffs' employment contract, noting plaintiffs had asserted a claim under the Seaman's Wage Act, a federal statute which created a right to payment of wages in favor of seamen on foreign vessels while in the harbors of the United States, as well as a breach of contract claim. *Id.* at 818, 820. The court found this statutory claim came into existence solely because of the defendant's commercial activity of sailing a ship into a United States port. *See id.* at 819-20. The court also found the federal statute overrode any contrary provisions in the plaintiffs' employment contracts, such that the statutory claim subsumed the plaintiffs' breach of contract claims. *See id.* at 820. The court thus had no occasion to address whether the defendant had engaged in commercial activity by entering into and breaching employment contracts with the plaintiffs.

Cir. 2004); *Holden v. Canadian Consulate*, 92 F.3d 918, 922 (9th Cir. 1996); *Segni v. Commercial Office of Spain*, 835 F.2d 160, 165 (7th Cir. 1987).

Where a plaintiff is employed in a civil service, diplomatic, or military capacity, or is otherwise "engaged in quintessentially governmental work," courts have generally regarded the employment as governmental.[7] *See, e.g.*, *El-Hadad*, 496 F.3d at 664 (holding "a foreign government's civil servants (and diplomats and soldiers) do *not* qualify for the commercial activity exception," nor do employees outside of these categories who are engaged in "quintessentially governmental work"); *Kato*, 360 F.3d at 112 (holding plaintiff's employment for a government instrumentality engaged in the "promotion abroad of the commerce of domestic firms" involved a quintessential government function and therefore was not commercial); *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 579 (7th Cir. 1989) (remarking "while private persons routinely enter employment agreements, employment contracts between a foreign state and its civil servants, diplomats or military personnel are not 'commercial' transactions, since the employment of such personnel is intimately connected with the foreign state's formulation and execution of government policy"). In contrast, where the plaintiff is not employed in any of these capacities and where the plaintiff's employment activities are themselves commercial in nature, the employment is regarded as commercial. *See, e.g.*, *Holden*, 92 F.3d at 922 (holding the plaintiff's employment was a commercial activity where she was neither a civil servant nor a diplomat and where "[t]he nature of [her] work, promotion of products, [wa]s regularly done by private persons"); *Segni*, 835 F.2d at 165 (same).

_____

[7] The courts have not taken a uniform approach to this issue. For example, some courts have treated a plaintiff's status as a civil service, diplomatic, or military employee as dispositive, while others have framed the inquiry in terms of the activity to which the plaintiff's employment was directed. *See El-Hadad*, 496 F.3d at 664 n.2 (describing different approaches).

The foregoing approach—whereby the commercial or governmental character of a plaintiff's employment by a foreign state depends on the nature of the employment relationship—would seem to be equally applicable to the sort of education funding/future employment agreement at issue in this case. If, for example, as one court has suggested, a foreign government's employment of a judge would be regarded as non-commercial because such a position involves "quintessentially governmental work," *El-Hadad*, 496 F.3d at 664, this Court sees no reason why an agreement to fund a person's legal studies abroad in exchange for the person's commitment to work as a judge upon completion of the foreign legal degree should not also be regarded as governmental. *Cf. UNC Lear Servs., Inc. v. Kingdom of Saudi Arabia*, 581 F.3d 210, 216-17 (5th Cir. 2009) (holding a technical support contract under which an American company sent its personnel to Saudi Arabia to provide training and support services to the Royal Saudi Air Force was sovereign in nature where employees performed their work under the contract in Saudi Arabia, were integrated with the Saudi Air Force, and could be considered military personnel).

Here, however, the nature of Abdulla's expected future employment by the Iraqi government is not at all clear from the Scholarship Contract itself. The Contract does not specify the particular government agency for which he is expected to work, the position he is expected to hold, or the nature of the work he is expected to perform. Rather, the Contract appears to leave these matters entirely to the government's discretion, providing simply that upon his graduation, Abdulla "shall be required to work in the agencies of the Republic of Iraq, in those projects and business determined by the state for a period of double the duration of his study." Scholarship Contract 2, ECF No. 34 at 5. The Contract also does not address whether Abdulla will be employed in a civil service (or diplomatic or military) capacity. While the Contract alludes to

certain unspecified "rules" pursuant to which his employment and salary will be determined (and which may apply in the event he is fired), there is nothing to suggest such rules are in the nature of civil service protections.

Under the burden-shifting process applicable to questions of immunity under the FSIA, Abdulla has the burden to produce some evidence that an exception to immunity applies, but "the ultimate burden of proving immunity from suit lies with [the foreign state]." *Fed. Ins. Co.*, 12 F.3d at 1285. Here, Abdulla has produced an English translation of the Scholarship Contract, which leaves the details of his future employment with the Republic of Iraq entirely to the state's discretion. Mindful that Abdulla cannot be expected to produce evidence "peculiarly within the possession of the defendant government," *Ohntrup v. Makina ve Kimya Endustrisi Kurumu*, No. 76-742, 1993 WL 315636, at *4 (E.D. Pa. Aug. 18, 1993), and because the Contract gives no indication his required work for the state will in fact involve uniquely governmental responsibilities or a position as a civil servant (or diplomatic or military employee), the Court finds Abdulla has satisfied his burden of production on the question of whether the Scholarship Contract constitutes commercial activity, even if the Contract is regarded as an employment contract. *Cf. Lasheen v. Embassy of the Arab Republic of Egypt*, 485 F. App'x 203, 206 (9th Cir. 2012) (holding Egyptian university professor was not a civil servant while in the United States on a student scholarship, even if professors were classified as civil servants under Egyptian law, where the professor "was effectively on sabbatical while studying in the United States" and in the absence of "persuasive evidence of civil service"); *Janini v. Kuwait Univ.*, 43 F.3d 1534, 1537 (D.C. Cir. 1995) (holding Kuwait University's unilateral termination of an American chemistry teacher's employment contract was commercial activity without addressing the nature

of the plaintiff's employment, where the defendant made no claim the teacher was a civil servant).

The Court also finds the commercial activity in this case has both a sufficient jurisdictional nexus with the United States and a sufficient substantive connection to the subject matter of Abdulla's cause of action to support jurisdiction under the commercial activity exception. *See Fed. Ins. Co.*, 12 F.3d at 1286. To come within the first clause of the exception, the action must be "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). Here, Abdulla sues the Embassy for breaching the Scholarship Contract by terminating his educational funding; hence, this case is "based upon" the commercial activity of entering into and allegedly breaching the Contract. *See Nelson*, 507 U.S. at 357 (holding a claim is based upon "those elements . . . that, if proven, would entitle a plaintiff to relief under his theory of the case"); *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1171 (9th Cir. 2010) (holding a suit for breach of a health benefit services management agreement was based on the commercial activity of entering into and breaching the agreement). The commercial activity on which this suit is based was also "carried on in the United States" within the meaning of the exception. To satisfy this requirement, the commercial activity must have been carried on directly in the United States or must have "a substantial connection to the United States." *Fed. Ins. Co.*, 12 F.3d at 1286; *see also* 28 U.S.C. § 1603(e). The Scholarship Contract requires Abdulla to pursue a Ph.D. degree in the United States and requires the Minister to fund Abdulla's education and living expenses during his American study. The Contract thus contemplates a substantial portion of Abdulla's contractual obligations, as well as the Minister's payment obligations, will be performed in this country, giving the Contract the requisite "substantial connection" to the United States. *See Tonoga, Ltd. v. Ministry*

*of Pub. Works & Hous. of the Kingdom of Saudi Arabia*, 135 F. Supp. 2d 350, 356-57 (N.D.N.Y. 2001) ("[W]hen the commercial activity in question centers on the formation of a contract, the United States will be found to have had a substantial contact with that activity if . . . substantial aspects of the contract were to be performed here." (internal quotation marks and citation omitted)).

Alternatively, even if the commercial activity underlying this action is regarded as having been carried on in Iraq, where the Scholarship Contract appears to have been executed, this action would come within either the second or third clause of the commercial activity exception. To come within one of these clauses, the action must be based upon either "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere" or "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The particular act on which Abdulla's breach of contract claim is based is the termination of his educational funding, an act taken in connection with the Scholarship Contract. Although it is not clear from the current record who or what office within the Iraqi government actually stopped Abdulla's funding, Abdulla alleges the Embassy's Office of Cultural Attaché notified him of the termination. Compl. ¶ III.C. According to the Complaint and the exhibits thereto, the Embassy is located in Washington, D.C.;[8] therefore, insofar as the Embassy was responsible for terminating Abdulla's funding, this case would fall within the second clause of the exception as it would be based on an act performed in the United States (the termination) in connection with Iraq's commercial activity elsewhere (the Scholarship Contract). If Abdulla's

_____

[8] The Complaint alleges the Embassy is located at 3421 Massachusetts Avenue, Washington, DC 20007. Compl. ¶ I.B. In addition, Abdulla has submitted a copy of a tuition check written on the account of the Embassy's Office of the Cultural Attaché, which lists the Embassy's address as 1801 P Street, NW, Washington, DC 20036. *See* ECF No. 6 at 6.

funding was instead terminated by the Minister (or other government personnel in Iraq), this case would come within the third clause of the exception. In such event, the termination would be an act outside the United States in connection with Iraq's commercial activity (the Contract) that caused a direct effect in the United States, where Abdulla was in school and where the educational funding the Minister was required to provide was to be paid. *See Weltover*, 504 U.S. at 618-19 (holding a foreign state's unilateral rescheduling of bond maturity dates had a "direct effect" in the United States where the rescheduled payments were due in New York).

Because this Court finds Abdulla has sufficiently demonstrated the Iraqi government engaged in commercial activity by entering into the Scholarship Contract, funding Abdulla's education pursuant to the Contract, and then terminating his funding, and because this commercial activity has the requisite jurisdictional nexus and substantive connection to this action, the Court concludes this case comes within the commercial activity exception and the Embassy is therefore not immune from suit.

B.     **Merits**

Under the FSIA, unlike in a case against a private party, a court may not enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). To satisfy this requirement, the plaintiff must "provid[e] satisfactory evidence as to each element of the claim[] upon which relief [is] sought." *Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996); *see also Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 838 (D.C. Cir. 2009) (observing "[t]he FSIA . . . does not automatically entitle a plaintiff to judgment when a foreign state defaults, and instead requires a court to satisfy itself that [the plaintiff has] established a right to relief" (internal quotation marks and citation

omitted)).  This requirement "does not impose on plaintiffs the burden of producing the full range of evidence that would be available to them if the opposing party had participated in discovery"; rather, "the quantum and quality of evidence that might satisfy a court can be less than that normally required."  *Ohntrup*, 1993 WL 315636, at *4 (internal quotation marks and citation omitted).[9]

Abdulla has submitted the following evidence in support of his breach of contract claim:

(1) a copy of the Scholarship Contract in Arabic, ECF No. 6 at 8-10;

(2) an English translation of the Contract, accompanied by a notarized certification from the translator stating he is competent in the English and Arabic languages and the translation was "rendered to the best of his knowledge," ECF No. 34 at 4-6;

(3) a financial support letter from the Minister, addressed "To Whom It May Concern," advising the recipient Abdulla has been "nominated to get Ph.D. Degree in the field 'Communication and Networks'" and his "[t]uition, accommodation fees, Language Course fees, health insurance, round-trip fares & miscellaneous expenses will be covered by Iraqi government/MOHESR through the Embassy of Republic of Iraq in the intended country," ECF No. 6 at 7;

---

[9]  This Court previously rejected Abdulla's argument, raised in an earlier motion for reconsideration, that the requirement under § 1608(e) that a plaintiff seeking a default judgment against a foreign state must prove his claim by evidence satisfactory to the court should not apply in this case because the Embassy's default was willful.  *See* ECF No. 37.  In a more recently submitted memorandum, Abdulla raises a variation of this argument, urging the Court to enter a default judgment as a "last resort sanction" for the Embassy's willful disregard of the judicial process pursuant to either Federal Rule of Civil Procedure 37(b)(2)(A)(vi) or the Court's inherent powers.  *See* Pl.'s Mem. in Supp. of Default J. 1-2, ECF No. 38.  As set forth in this Court's prior order, the argument that the requirements of § 1608(e) do not apply in the case of a foreign state's willful default is not supported by the language of the statute or the case law.  Moreover, Abdulla's citation to Rule 37(b) is unavailing, as the Rule concerns the sanctions a court may impose for a party's failure to obey a discovery order and is thus inapplicable in the circumstances here.  Consequently, the Court declines to enter a default judgment without considering whether Abdulla has presented evidence establishing his right to relief.

(4) a copy of a check for $5,135.48, written from the account of the Embassy's Office of the Cultural Attaché and payable to UALR for Abdulla's Spring 2009 tuition, ECF No. 6 at 6;

(5) a copy of an email from the Iraqi Cultural Attaché requesting that any student studying in the United States complete an authorization enabling the Embassy to access the student's medical information so as to facilitate the Embassy's management of the student's health insurance benefits, ECF No. 16 at 4-5;

(6) a copy of Abdulla's official UALR transcript, issued on April 20, 2010, ECF No. 38 at 6;

(7) a copy of a May 10, 2010, letter from Patrick J. Pellicane, Ph.D., the Vice Provost for Research and Dean of the Graduate School at UALR, to Dr. Hadi Al-Khalili of the Iraqi Cultural Office, Embassy of Iraq, advising Al-Khalili that Abdulla "has been dismissed for academic reasons from the PhD Program in Applied Science at the University of Arkansas at Little Rock," effective February 12, 2010, ECF No. 38 at 5; and

 (8) a copy of a December 2010/January 2011 email exchange among Abdulla, Dr. Pellicane, and Dr. Haydar Al-Shukri (also of UALR) regarding the reasons for Abdulla's dismissal, ECF No. 38 at 7-9.

The foregoing evidence shows Abdulla entered into a Scholarship Contract with the Minister under which the Minister agreed to fund his Ph.D. studies in the United States for three years, with tuition and living expenses (including health insurance) to be paid by the Iraqi government through its American Embassy.  This evidence also shows the Embassy initially funded Abdulla's education pursuant to the Contract, and that Abdulla completed two semesters at UALR (Spring 2009 and Fall 2009) and was enrolled in a third semester (Spring 2010) when

he was notified he had been dismissed from his graduate program and his funding under the Scholarship Contract would be terminated.

Although Abdulla has submitted no evidence regarding the Embassy's (or the Minister's) decision to terminate the Contract, he alleges he was first notified he would no longer be funded on April 15, 2010, when Embassy personnel called and advised him the University had informed the Embassy that Abdulla was "no longer attending the university for being ac[]ademically dismissed." Pl.'s Mem. in Supp. of Default J. 3, ECF No. 38; *see also* Compl. ¶ III.C. Abdulla contends he contested the allegation regarding his dismissal by ordering his transcript on April 20, 2010, and sending it to the Embassy, which later advised him his dismissal had been confirmed by the dean of the graduate school on May 10, 2010. Pl.'s Mem. in Supp. of Default J. 3, ECF No. 38.

Abdulla's claim that the termination of his funding constitutes a breach of the Scholarship Contract is based largely on the last three items of evidence described above: the April 20, 2010, transcript; the May 10, 2010, letter from Dr. Pellicane to the Embassy regarding his dismissal; and the December 2010/January 2011 email exchange between Abdulla and representatives of the University. In the May 10 letter, Dr. Pellicane advised the Embassy Abdulla had been dismissed from UALR's Applied Science Ph.D. program for academic reasons, explaining:

> Mr. Abdulla has failed to meet the minimum standards for acceptable academic performance. He has received the grade of 'D' in two different courses in the spring of 2009. According to policy in the Applied Science Program, a student who receives two 'C' grades or less is subject to dismissal depending upon the recommendation from the Doctoral Affairs Committee. At their last meeting, this committee has decided to dismiss Mr. Abdulla from their program. His dismissal was effective on 12 February 2010.

ECF No. 38 at 5.

The email exchange reflects that Abdulla wrote to Dr. Pellicane on December 16, 2010, after receiving a copy of the May 10 letter, requesting an "official explanation of [the letter's] contents."[10]  *Id.* at 8-9.  In his email, Abdulla notes Dr. Pellicane's statement that Abdulla's dismissal was effective on February 12, 2010, is contradicted by his April 20, 2010, transcript, which he contends shows he was in good academic standing as of that date.  *Id.* at 9.  He also questions why the University "still received the tuition fee of the Spring semester which [he] normally finished without being notified of any kind of dismissal all along the semester," and objects to the University's release of information concerning his academic standing to the Embassy without notifying him.  *Id.*  On December 17, 2010, Dr. Pellicane referred Abdulla's inquiry to Dr. Al-Shukri, who responded to Abdulla on January 3, 2011, explaining the dismissal letter as follows:

> When the dismissal decision was reached by the Doctoral Affairs Committee, the Iraqi Embassy called me and requested that UALR send an official letter of the dismissal.  I requested that Dean Pellicane issue the letter and send [it] to the Iraqi Embassy.  The rules of good standing of the Applied Science PhD students are very clear and they have been explained to you repeatedly.  The decision for the dismissal was due to the repeated unacceptable grades during your coursework.  I refer you to the Applied Science Student Handbook to review these rules.

*Id.* at 7.  As to Abdulla's privacy concerns, Dr. Al-Shukri explained Abdulla, like all students sponsored by the Iraqi Embassy, had "sign[ed] a consent allowing UALR to report transcripts and annual report to the Iraqi Embassy in Washington DC."[11]  *Id.*

Abdulla argues these documents prove the Embassy breached the Scholarship Contract because they show the Embassy "was engaged in a conspiracy with the university to produce a

---

[10] The email notes Abdulla had requested a copy of the May 10 letter months earlier, on May 21, 2010.  ECF No. 38 at 8.

[11] Although Dr. Al-Shukri indicated he was attaching the consent Abdulla had signed to his email, the attachment is not included in the record before the Court.

letter to damage [his] academic reputation and use it as an ex[]cuse for breaching the contract." Pl.'s Mem. in Supp. of Default J. 3, ECF No. 38. In support of his conspiracy allegation, Abdulla cites his official transcript as evidence he was in good academic standing at the time of his dismissal. He also cites Dr. Al-Shukri's admission in his email to Abdulla that the May 10 letter was sent at the Embassy's request, and notes the letter did "not reflect[] [his] ac[]ademic record." *Id.*

Even holding Abdulla to a lesser evidentiary burden than "normally required," *see Ohntrup*, 1993 WL 315636, at *4, this evidence is insufficient to prove the Embassy terminated Abdulla's funding as part of a conspiracy with the University. The documents submitted by Abdulla do raise some questions regarding the University's decision to dismiss him from the Applied Science Ph.D. program. While Dr. Pellicane's May 10 letter states the Doctoral Affairs Committee decided to dismiss Abdulla because he had received a "D" grade in two courses in the Spring 2009 semester, Abdulla's transcript shows only one "D" grade, along with one "A" grade and a grade of "CR" in his remaining two courses that semester.[12] Moreover, Abdulla's April 20, 2010, transcript does not reflect the fact of his dismissal, even though, according to the May 10 letter, the dismissal was effective as of February 12, 2010.[13] It is also not clear from the

---

[12] The Applied Science Student Handbook, which Dr. Al-Shukri described as the source of the rules of good standing for Applied Science Ph.D. students, *see* ECF No. 38 at 7, is not part of the record in this case. The Court notes that the 2009-2010 version of the Handbook, which is available on the University's website, provides "[a] student receiving two 'C's or either a D or an F in his/her coursework will be dismissed from the program, pending review by the [Doctoral Affairs Committee]." Dep't of Applied Science 2009-2010 Graduate Student Handbook 8, *available at* http://ualr.edu/appliedscience/files/2010/08/Graduate_Student_Handbook.pdf (last visited Sept. 9, 2013).

[13] The transcript is inconclusive as to Abdulla's academic standing as of its April 20, 2010, issue date. The transcript lists Abdulla as being in "Good Standing" at the conclusion of both the Spring 2009 and the Fall 2009 semesters, but does not provide his academic standing for the

current record when—or whether—the University notified Abdulla of the Doctoral Affairs Committee's decision to dismiss him.

Whatever questions this evidence may raise about the University's decision to dismiss Abdulla, there is no evidence the Embassy had any involvement in that decision. The only evidence of any communication between the Embassy and the University about Abdulla's dismissal prior to the May 10 letter in which the University notified the Embassy of the reasons for the dismissal is Dr. Al-Shukri's email to Abdulla, in which Al-Shukri states the May 10 letter was prepared at the Embassy's request. The email indicates, however, that the Embassy requested an official letter regarding the dismissal only after the Doctoral Affairs Committee reached its decision. There is no evidence the Embassy played any role in the Doctoral Affairs Committee's consideration of Abdulla's academic performance. The Court therefore finds Abdulla has not shown the Embassy conspired with the University to obtain a letter regarding Abdulla's academic performance that could be used to terminate his funding under the Scholarship Contract.

Alternatively, Abdulla argues that even assuming the University's proffered reasons for dismissing him are true, the Embassy's termination of his funding still constitutes a breach of paragraph 5 of the Contract, which addresses how funding will be affected by a student's academic failure. Paragraph 5 provides:

> If the student fails for a reason other than disease at the end of a semester or a term, his funds shall be cut off one month after his failure and the Minister shall fund him as a loan for one year. This one year period will be added to his required years of employment in State agencies and he shall also be required to pay back the amount of the loan. If the student fails for a second time, the Minister shall end his study and require him to pay back double the amount that has been spent on him. But if the failure was for a disease preventing him from

Spring 2010 semester, instead referring to his work for the semester as "in progress." ECF No. 38 at 6.

21

> continuing his study, his study shall be terminated and he would not be required to pay back any amount that has been spent on him provided that the student's medical condition is supported by medical reports from Iraqi agencies.

Scholarship Contract 2, ECF No. 34 at 5. In his recently filed memorandum, Abdulla notes that even in the event of failure, the Contract requires the Minister "to still fund the student on loan for one year." Pl.'s Mem. in Supp. of Mot. for Default J. 3, ECF No. 38. He also appears to contend his transcript refutes any claim of academic failure and asserts he has never been placed on academic probation, which is a prerequisite for academic dismissal in the United States. *See id.*

Insofar as Abdulla argues the termination of his funding was improper because his transcript shows he was in good academic standing at the time of his alleged dismissal from the Ph.D. program, the record does not support this argument. The transcript, as noted, is inconclusive as to Abdulla's academic status in the spring of 2010. Moreover, both Dr. Pellicane's May 10 letter and Dr. Al-Shukri's January 2011 email indicate the University dismissed Abdulla for poor academic performance on the recommendation of the Doctoral Affairs Committee. Even if the University's decision was improper, as Abdulla alleges, he has offered no evidence that the University did not actually dismiss him or that the Embassy's decision to terminate his funding was not based on his dismissal from the program to which his funding applied.

Insofar as Abdulla argues the Embassy breached the Scholarship Contract by terminating his funding rather than continuing to fund him as a loan for one year, this argument is also not persuasive. Although paragraph 5 of the Contract contemplates a student's failure will result in termination of his funding only if the student fails at the end of two semesters, this provision does not specifically address the situation in which a student's academic failure results in his

dismissal from his institution of study. The Contract cannot reasonably be interpreted to require the Minister to continue to fund a student in the event of such a dismissal. Notably, paragraph 6 of the Contract affirmatively prohibits a student from changing "the country in which he is studying, the department, the institution, or the degree for which he has agreed except in extraordinary conditions in favor of both parties," and provides that any such change "shall depend on a recommendation from the institution in which he is studying supported by the opinion of the cultural advisor or whoever represents him, together with his supervisor." Scholarship Contract 2, ECF No. 34 at 5. In the event the student has passed his general study and "initiat[ed] his majoring," such a change "shall not take place whether in the department, degree, the institution or the country of study unless it has been approval from specialized parties in the Republic of Iraq." *Id.* Abdulla has not presented any evidence of "extraordinary conditions" that would have justified a change in institution following his dismissal from UALR, nor has he shown there was another Ph.D. program to which his funding could even have been transferred.[14] Thus, because the evidence currently before the Court suggests Abdulla's funding was terminated because he was dismissed from the UALR Ph.D. program, and because the Contract does not appear to require the Minister to continue a student's funding in the event of such a dismissal, the Court finds Abdulla has not shown the termination of his funding constitutes a breach of the Contract.

The Court notes that even if Abdulla were able to show a breach by the Embassy, this Court would still not be able to grant relief based on the existing record because Abdulla has not demonstrated the damages he seeks are consistent with the law of any of the jurisdictions whose

---

[14] Abdulla's requested damages include $28,109.15 to reimburse him for "the amount that I have paid for my tuition and fees since they have cut off my funding." Compl. ¶ V. However, it is not clear whether this amount was paid to UALR or another institution or what period of time such payments cover.

law might potentially be applicable in this case, and has not provided this Court with sufficient information from which to determine which jurisdiction's law in fact governs the instant dispute. Although there is no Third Circuit case law on point, a majority of the circuit courts that have considered the issue have held a district court should apply the forum state's choice of law rules in an FSIA case raising claims based on state substantive law. *See, e.g.*, *Oveissi*, 573 F.3d at 841 (collecting cases). "Pennsylvania applies the . . . flexible 'interests/contacts' methodology to contract choice-of-law questions." *Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012) (quoting *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 226-27 (3d Cir. 2007)). Under this approach, a court must first identify the jurisdictions whose laws might apply and determine whether there is a "true conflict" between (or among) them.[15] *See Pac. Emp'rs Ins. Co.*, 693 F.3d at 432. If a true conflict exists, the court must then determine which jurisdiction "has the greater interest in the application of its law" by assessing each jurisdiction's contacts under the *Restatement (Second) of Conflicts of Law*[16] and considering "the interests and policies that may be validly asserted by each jurisdiction." *Hammersmith*, 480 F.3d at 231-35 (internal quotation marks and citations omitted).

Abdulla's filings do not address the choice of law issue or identify the law he believes governs his breach of contract claim. The Scholarship Contract is an agreement between an Iraqi citizen and a representative of the Iraqi government which, presumably, was entered into in Iraq, where Abdulla resided before he began his studies pursuant to the Contract, and the Contract

---

[15] A true conflict exists only if there is "an *actual* or real conflict between the potentially applicable laws" and if "*both* jurisdictions' interests would be impaired by the application of the other's laws." *Hammersmith*, 480 F.3d at 230.

[16] Such contacts include "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Hammersmith*, 480 F.3d at 233.

requires Abdulla to return to Iraq upon completion of his studies.  Therefore, it seems likely the Contract would be governed by Iraqi law, even though Abdulla's education pursuant to the Contract was to take place in the United States.  Because Abdulla began his studies at UALR, it is also possible the Contract could be governed by Arkansas law.  Abdulla has produced no evidence regarding Iraqi contract law that would permit the Court to determine whether Iraqi law conflicts with Arkansas law or whether Iraqi law authorizes the relief Abdulla seeks. Accordingly, the motion for default judgment is denied for this reason as well.[17]  *See Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*, 684 F. Supp. 2d 34, 41-42 (D.D.C. 2010) (denying without prejudice a motion for default judgment in an FSIA case upon determining that plaintiffs' claims were governed by Israeli law, where plaintiffs had evaluated their claims solely under California law and thus failed to establish their entitlement to relief under Israeli law).

For the reasons set forth above, the Court concludes Abdulla has satisfied his burden to produce evidence showing this action falls within the commercial activity exception to sovereign immunity, but has not satisfied his burden to "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  Accordingly, Abdulla's motion for default judgment will be denied based on the existing record.  Abdulla shall have 21 days to notify the Court whether he wishes to seek reconsideration or to submit additional evidence to establish his right to relief under the applicable law.  Alternatively, if Abdulla does not wish to pursue further

---

[17] It is also not clear whether relief would be available against the Embassy under the law of either jurisdiction, as it is not clear the Embassy could be deemed to be a party to the Scholarship Contract based on its role in administering the Contract.  *See* Scholarship Contract 1, ECF No. 34 at 4 (defining the "First Party" to the Contract as "[t]he Minister of higher education and Scientific Research in his official capacity *as well as whoever represents him*" (emphasis added)); *cf.* ECF No. 6 at 7 (financial support letter stating Abdulla's tuition and living expenses "will be covered by Iraqi government/MOHESR through the Embassy of Republic of Iraq in the intended country").

relief from this Court, he shall have 21 days to show cause why this case should not be dismissed.

BY THE COURT:


_____/s/ Juan R. Sánchez_____
Juan R. Sánchez, J.